Lara Shalov Mehraban
Thomas P. Smith Jr.
Richard Hong
Cynthia A. Matthews
*Attorneys for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Room 400
New York, NY  10281-1022
(212) 336-0956 (Hong)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-against-<br><br>LISA BERSHAN, BARRY B. SCHWARTZ, and JOEL J. MARGULIES,<br><br>Defendants. | COMPLAINT AND JURY DEMAND<br><br>17 Civ.    (   )<br><br>ECF CASE |

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against Defendants Lisa Bershan ("Bershan"), Barry B. Schwartz ("Schwartz"), and Joel J. Margulies ("Margulies") (collectively, "Defendants"):

### SUMMARY OF ALLEGATIONS

1. Beginning in approximately August 2015 through June 2017, Bershan, Schwartz, and Margulies, who controlled Starship Snacks, Corp. ("Starship"), orchestrated a fraudulent scheme, in which they conned more than 35 investors into investing over $2.2 million in

Starship, a company that purportedly was developing and marketing a caffeinated chocolate snack.

2. Bershan, the Chief Executive Officer ("CEO") and founder of Starship, and Margulies, a principal at the company, induced investments by making various material misrepresentations to investors. They promised, among other things, that Starship was developing and was ready to mass produce its own caffeinated snack; that Starship would soon be acquired, at first, by Monster Energy Company ("Monster"), and later The Coca Cola Co. ("Coke"); and that investors would get a one-for-one share exchange of Starship shares for Monster or Coke shares. Bershan also personally guaranteed investors, with a "Share Price Guarantee," that they could redeem their entire investment plus 5% interest after 12 months, if the value of the purchased shares had not achieved a substantially higher capitalized value. Bershan and Margulies also represented to investors, in writing, that the investment had "no down-side risk."

3. In reality, the Defendants knowingly, recklessly or negligently ran an investment scam. Contrary to the representations, Starship never developed or was ready to produce for mass production its own caffeinated snack. Nor was Starship ever in negotiations with either Monster or Coke to be acquired; in fact, the company did not have any business relationship with either entity.

4. Moreover, Bershan's personal "Share Price Guarantee" was false and/or misleading. Investors were not able to recoup the "guaranteed" return of their investment plus interest at any time. Bershan and Schwartz (Bershan's husband) had misappropriated and dissipated investor funds, through their withdrawal of over $1 million in cash and their use of the

remainder to maintain an extravagant lifestyle. In short, investors in Starship did not get what Defendants had promised them and they lost their money.

5. Indeed, when investors began to question the timing of the acquisition and to ask for financial documentation, the Defendants sought to conceal the fraudulent scheme with more lies. They continued to misrepresent to investors that negotiations with Monster and Coke were ongoing and that an acquisition by either Monster or Coke was imminent. Further, they lied by saying that they were prohibited by nondisclosure agreements from giving investors any specific information, financial or otherwise, about the deal.

6. By virtue of the conduct alleged herein, Bershan and Margulies, directly or indirectly, singly or in concert, knowingly, recklessly, or negligently have engaged in fraudulent conduct in violation of:

    a. Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and

    b. Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. In addition, by virtue of the conduct alleged herein, Schwartz, directly or indirectly, singly or in concert, knowingly, recklessly, or negligently has engaged in fraudulent conduct in violation of:

    a. Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)]; and

    b. Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

8. For the foregoing violations, the Commission seeks a final judgment ordering the Defendants to disgorge their ill-gotten gains on a joint and several basis and to pay prejudgment interest thereon, and ordering the Defendants to pay civil money penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

9. Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

10. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

11. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

12. Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York. Among other things, venue lies in this District because Bershan and Schwartz opened bank accounts in the name of Starship in this District, and, according to the bank account records, investor funds were wired to accounts with addresses in this District.

13. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## DEFENDANTS

14.     **Bershan**, age 60, resides in San Diego, California. Bershan is the CEO and founder of Starship. She participated in all aspects of the fraudulent scheme alleged herein. Before forming Starship, Bershan was the President, Secretary and Director of All American Pet Company, Inc. ("AAPC"). Bershan is not and has never been registered with the Commission in any capacity and holds no securities licenses.

15.     **Schwartz**, age 71, resides in San Diego, California. He is the husband of Bershan and is affiliated with Starship. While involved with the fraudulent scheme from the outset, Schwartz became a primary contact for investors after the purported termination of Margulies from Starship in or around October 2016. Before becoming involved with Starship, Schwartz was the CEO and Chairman of the Board of AAPC. Pursuant to a November 2014 order by the State of California - Department of Business Oversight, All American Pet Company, Inc. ("AAPC") and Schwartz were ordered to desist and refrain from offering the securities of AAPC, because they offered the securities in an offering that failed to qualify for an exemption under Reg. D and the offering documents falsely represented that the exemption had been satisfied. Schwartz is not and has never been registered with the Commission in any capacity and holds no securities licenses.

16.     **Margulies**, 72, resides in Murfreesboro, Tennessee. He acted and held himself out as a principal of Starship, until he was purportedly terminated by Starship in or around October 2016. Margulies was the primary source of contact for investors, whether by email or phone. Margulies is not and has never been registered with the Commission in any capacity and holds no securities licenses.

## RELEVANT ENTITIES

17.     **Starship** is a Delaware corporation, with its principal place of business in New York, New York. Starship, a privately-held company, was formed in or around August 2015 and incorporated in October 2015. Its predecessor company was The Awake Co. ("Awake"), a Nevada corporation, with its principal place of business in Beverly Hills, California. In or around May 2016, investors exchanged their Awake shares for Starship shares. Unless otherwise noted, references to Starship herein include the predecessor Awake. Starship purports to be a manufacturer, marketer and distributor of a chocolate caffeinated snack.

18.     **AAPC** was a Nevada corporation with its principal place of business in Los Angeles, California. AAPC purported to develop, manufacture and market packaged products for dogs. As discussed above, AAPC was the subject of a State of California - Department of Business Oversight Cease and Desist Order.

## DEFENDANTS' FRAUDULENT CONDUCT

**How the Fraudulent Scheme Began**

19.     In the wake of their prior business failures, most notably AAPC, the Defendants started their new private company, Starship, in and around May 2015, as a vehicle for their fraudulent scheme.

20.     Between May 2015 and August 2015, Bershan and Margulies discussed with an investor who had invested in AAPC (the "AAPC Investor") an opportunity to recoup his losses by investing in Starship. To induce his investment, they knowingly, recklessly, or negligently misrepresented that Starship was in negotiations to be acquired by or partner with Monster, the energy drink manufacturer. They explained that Monster was interested in Starship's caffeinated snacks and that Coke, having recently acquired a portion of Monster, was looking for a product

with which to compete with Pepsi in the snack business.

21.     In and around August 2015, Bershan and Margulies provided the AAPC Investor with offering documents, including a term sheet, describing the offering of securities, and which included Bershan's personal guarantee that protected investors from "any downside loss of principal." Specifically, Bershan provided the AAPC Investor with a written "Share Price Guarantee" in which she personally agreed to buy back the shares purchased, at the original "discounted" purchase price of $3.00 per share, if, on the one-year anniversary of the investment, the purchased shares had not achieved a capitalized value of $23.00 to $25.00 per share. In addition, pursuant to the personal guarantee, Bershan agreed to pay the AAPS Investor 5% interest and to make both payments within 10 working days of the investor's redemption request. Bershan and Margulies also represented in an email that, because of the personal guarantee, the investment had "no down-side risk."

22.     In addition, Bershan and Margulies presented to the AAPC Investor the Starship term sheet, which set the purchase price at $5.00 per share, but offered a discount price of $3.00 per share, and promised (i) annual financial statements and "narrative update reports from Company management" to all investors; (ii) quarterly financial and narrative update reports from management; and (iii) inspection rights to "Major Investors" who invested at least $25,000.

23.     Based on the foregoing material representations, the AAPC Investor invested $25,000 in Starship on or about August 21, 2015.

24.     Also, in or around August 2015, Bershan advised the AAPC Investor that Starship needed an additional $200,000 for start-up costs and asked the investor to share the Starship investment opportunity with friends and family. At Bershan's and Margulies' urging, the AAPC Investor shared Margulies' and Bershan's representations regarding Starship to his family and

friends, several of whom spoke with Bershan and/or Margulies to confirm the information before investing.

25. Bershan and/or Margulies also falsely represented to at least two investors that Starship had a contract with an Argentinian candy manufacturer, and with the US Army, 7-11 stores, and miscellaneous book stores for distribution.

26. In reality, Starship never developed or was ready to mass produce its own caffeinated snack. Nor was Starship ever in negotiations with either Monster or Coke to be acquired or to partner; in truth, the company did not have any business relationship with either entity. Also, Bershan's personal "Share Price Guarantee" was false and/or misleading as she knew, recklessly disregarded or should have known. Investors were not able to recover the "guaranteed" return of their investment plus interest at any time, as investor funds had been misappropriated and dissipated by Bershan and Schwartz. Finally, despite the Starship term sheet's representations that Starship would provide Major Investors with quarterly financial reports and all investors with annual financial statements, the Defendants never provided investors financial information of any kind, despite numerous requests.

27. These misrepresentations were material because they provided information that was important to investors in deciding whether to invest in Starship, and they provided investors with (false) confidence that Starship was a legitimate business with serious business prospects and worthy of investment.

28. By September 15, 2015, Bershan represented to the AAPC Investor that Starship had reached its $200,000 seed goal.

**How the Fraudulent Scheme Expanded**

29. On or about October 17, 2015, Margulies and Bershan represented to certain

investors that Starship had signed a deal with Monster providing for a one-for-one share exchange of Starship shares for Monster shares. When making that representation, Margulies and Bershan knew, recklessly disregarded, or should have known that that representation was false as Starship had no such deal, or any kind of deal with Monster. Investors were provided with a limited 10 business day window to add to their investment in Starship.

30. Through this material misrepresentation, Margulies and Bershan were able to solicit investments from new investors, and additional investments from existing investors. From October 18, 2015 to October 3, 2016, Margulies and Bershan raised $1,769,430 from at least 30 investors.

31. Bershan and Margulies communicated with individual investors, confirming to them that the Starship and Monster transaction was imminent when they knew, recklessly disregarded or should have known that their representations were false.

32. Margulies also instructed investors to write checks or wire funds initially to an account affiliated with AAPC, for which he was listed as the owner, and later to an account in Starship's name. Further, Margulies co-signed the cover letter for the offering documents, which described and repeated Bershan's personal guarantee, and provided the AAPC Investor with the Starship term sheet and other offering documents to distribute to at least two other investors (who invested on or about August 27, 2015 and August 28, 2015).

33. Through mid-October of 2016, Bershan and Margulies continued to solicit investors with the misrepresentations discussed above. They obtained more than $2.2 million from over 35 investors. In an August 15, 2016 email to an investor, for example, Margulies falsely stated that "… the remaining [Starship] shares, which are very limited – will be acquired by Monster if not sold to our circle [of] friends and family." When making that statement,

Margulies knew, recklessly disregarded, or should have known, that that statement was false as there was no basis to claim Starship shares would be acquired by Monster.

**How the Fraudulent Scheme Was Perpetuated**

34. Schwartz and Margulies extended the scheme through June 2017, by assuring investors that the Monster/Coke deal was imminent and that they could redeem their investments plus interest in accordance with the Bershan personal guarantee.

35. On a few occasions when Bershan and Margulies, or Schwartz, sent any form of investor update, it contained a false assurance that the investments were secure, offered an excuse for the delay, and/or claimed that a Monster or Coke deal was imminent.

36. For example, in November 2015, Margulies wrote to investors: "We want to assure you that your investment is secure. The [Starship] shares you purchased will be exchanged one for one as promised…. The deal is on and your shares will be issued shortly." Yet in the same email, Margulies notified investors that the company would need to change its name (purportedly due to trademark issues) and anticipated that this change could cause a six week and possibly longer delay. In January 2016, Margulies notified investors that share certificates had been issued incorrectly, purportedly requiring reissuance and an additional week-long delay. And in a November 15, 2016 email to an investor, in response to the investor's concern that the deal was "basically dead," Schwartz wrote: "this is not dead at all" and in a second email to the investor on the same day reiterated, "Our [Monster] deal is far from dead." When making these statements to investors, Margulies and Schwartz knew, recklessly disregarded or should have known that their statements were false.

37. Investors called and emailed Bershan, Schwartz and Margulies on numerous occasions for specific information as to when the Monster deal would be finalized and for

financial documentation, only to be ignored or chided for making the inquiries, but never provided with the information they sought. For example, in an August 11, 2016 email to an investor, Margulies claimed that he could not provide an update, as "sharing that information would be material information and considered insider trading."

38. When Bershan, Schwartz or Margulies did respond, they falsely claimed they were unable to provide investors with such information because it was confidential, and/or that they were subject to non-disclosure agreements ("NDAs") that Starship had signed with Monster and/or Coke. For example, Margulies wrote in an August 21, 2015 email to an investor: "I understand that you and your associates would like more information, but we are under strict NDA's . . . . This is secret stuff." In reality, no such agreements existed. When making these statements to investors, Margulies and Schwartz knew, recklessly disregarded or should have known that their statements were false.

39. In or around October 2016, Schwartz took responsibility for communication with investors, when he advised investors that Margulies had been terminated.

40. Shortly thereafter, Schwartz held an investor conference call, in which he informed investors that there had never been a deal for Monster to acquire Starship. On the call, Schwartz falsely claimed that Bershan was seeking a packaging and distribution partner for Starship, and that she was in negotiations with both Monster and Coke. Schwartz said that both companies were competing for a deal with Starship, that they had already agreed to most parts of the deal, and that Bershan would take the better deal. When making these statements to investors, Schwartz knew, recklessly disregarded or should have known that his statements were false.

41.     On the conference call and in other communications with investors, Schwartz blamed Margulies for any confusion investors might be feeling and claimed he would honor investors' rights to terminate their investment under Bershan's personal guarantee. In the same conference call, Schwartz advised investors to hold onto their shares, assuring them that the deal would yield a far greater return than Bershan's personal guarantee.

42.     These statements were false. Schwartz knew, recklessly disregarded or should have known that there was no deal (imminent or otherwise) with Monster; and there were no funds to support Bershan's personal guarantee. In fact, when investors subsequently sought to redeem their shares under the guarantee, they were unable to do so.

**How Investor Funds Were Misappropriated**

43.     Over the course of the fraudulent scheme, Bershan, Schwartz, and Margulies took in at least $2.2 million in investor funds.

44.     While Margulies was listed as an owner on the initial bank account Starship used, Bershan and Schwartz were the authorized signatories on that account and the subsequent Starship bank accounts. They had control over the accounts and access to the account information.

45.     Bershan and Schwartz knowingly, recklessly, or negligently used these accounts as their own personal piggy bank; withdrawing cash regularly from the Starship accounts to spend on personal, non-business expenses. Between August 2015 and October 2016, they withdrew over $1 million in cash, and, in addition, spent over $280,000 to rent a Manhattan apartment over an 11-month period, over $150,000 on retail purchases, over $140,000 in travel and restaurant expenses, almost $85,000 in medical and pharmaceutical costs and over $40,000 on interior decorating expenses. The remainder of the investors' funds was dissipated on non-

Starship expenses.

46. Bershan and/or Schwartz also transferred investor funds among Starship bank accounts and commingled Schwartz's social security payments with investor funds. On several occasions, Bershan and/or Schwartz withdrew investor money in cash on the same day it was deposited.

47. Further, Bershan and Schwartz transferred money from the Starship account to another account they controlled in the name of a third company, and withdrew cash or spent the investor funds deposited therein on their personal, non-business expenses. On more than one occasion, when an investor wired their investment to, or deposited it in, the Starship account, Bershan and/or Schwartz withdrew it immediately thereafter.

48. Margulies knowingly, recklessly, or negligently arranged for proceeds of the fraudulent scheme to be used for non-business related items. He assisted Bershan on a high-end interior decorating project that she paid for with investor funds. Margulies received over $50,000 of the investor funds raised.

49. By October 2016, the Defendants had spent all investor funds.

### FIRST CLAIM FOR RELIEF

**(Violations of Section 17(a) of the Securities Act)**
**(Against Bershan and Margulies)**

50. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 49 of this Complaint.

51. By virtue of the foregoing, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly, Bershan and Margulies knowingly, recklessly or negligently: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue

statement of a material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which would operate as a fraud or deceit upon the purchaser.

52. By reason of the conduct described above, Bershan and Margulies, directly or indirectly violated and, unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**(Violations of Section 17(a)(1) and (3) of the Securities Act)**
**(Against Schwartz)**

53. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 49 of this Complaint.

54. By virtue of the foregoing, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly, Schwartz knowingly, recklessly or negligently: employed devices, schemes or artifices to defraud; and/or engaged in transactions, acts, practices and courses of business which would operate as a fraud or deceit upon the purchaser.

55. By reason of the conduct described above, Schwartz, directly or indirectly violated and, unless enjoined, will again violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### THIRD CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**
**(Against Bershan and Margulies)**

56. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 49 of this Complaint.

57. By virtue of the foregoing, Bershan and Margulies, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

58. By virtue of the foregoing, Bershan and Margulies, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c))**
**(Against Schwartz)**

59. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 49 of this Complaint.

60. By virtue of the foregoing, Schwartz, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or

recklessly: employed devices, schemes or artifices to defraud; and/or engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

61. By virtue of the foregoing, Schwartz, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining the Defendants from committing or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this Complaint;

### II.

Ordering the Defendants disgorge the ill-gotten gains they obtained as a result of the violations alleged in this Complaint on a joint and several basis, and ordering them to pay prejudgment interest thereon;

### III.

Ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and

### IV.

Granting such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
October 11, 2017

By: _____
Lara Shalov Mehraban
Thomas P. Smith Jr.
Richard Hong
Cynthia A. Matthews
*Attorney for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street, Room 400
New York, NY  10281-1022
(212) 336-0589 (Hong)
Email: HongR@sec.gov